## NOTICE:   SLIP OPINION
### (not the court's final written decision)

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
JANUARY 20, 2022

*González C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JANUARY 20, 2022

*Erin L. Lennon*
ERIN L. LENNON
SUPREME COURT CLERK

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | |
| Respondent, | ) | No. 99407-2 |
| | ) | |
| v. | ) | |
| | ) | |
| GROCERY MANUFACTURERS | ) | |
| ASSOCIATION | ) | |
| Petitioner. | ) | Filed: January 20, 2022 |
| | ) | |

GONZÁLEZ, C.J.—Voters have a right to know who funds their elections. To enforce that right, candidates and political committees are required to disclose their contributors or face a penalty for failing to do so. We are asked today whether the penalty for intentionally concealing the source of political contributions may be based on the amount concealed. We conclude that it may and accordingly affirm.

BACKGROUND

Washington voters have the constitutional right to propose laws and, when the legislature does not enact their proposals, vote on final passage. WASH. CONST. art. II, § 1. Using this power, Washington voters proposed and passed Washington's Fair Campaign Practices Act (FCPA or act), ch. 42.17A RCW. The FCPA is an attempt to make elections and politics as fair and transparent as

*State v. Grocery Mfrs. Ass'n*, No. 99407-2

possible; and to accomplish that goal, the act requires candidates, political

committees, and lobbyists to disclose their campaign contributions and spending.

LAWS OF 1973, ch. 1 (codified in part at chapter 42.17A RCW); *see also Voters*

*Educ. Comm. v. Pub. Disclosure Comm'n*, 161 Wn.2d 470, 479-80, 166 P.3d 1174

(2007). The FCPA establishes that it is "the public policy of the State of

Washington . . . [t]hat political campaign and lobbying contributions and

expenditures be fully disclosed to the public and that secrecy is to be avoided" and

"[t]hat the public's right to know of the financing of political campaigns . . . far

outweighs any right that these matters remain secret and private." LAWS OF 1973,

ch. 1, § 1(1), (10) (currently codified at RCW 42.17A.001(1), (10)).

The FCPA compels disclosure and "compelled disclosure may encroach on

First Amendment rights by infringing on the privacy of association and belief."

*Voters Educ. Comm.*, 161 Wn.2d at 482 (citing *Buckley v. Valeo*, 424 U.S. 1, 64,

96 S. Ct. 612, 46 L. Ed. 2d 659 (1976)). To guard against infringing on these First

Amendment rights, laws mandating disclosure "must survive 'exacting scrutiny.'"

*Id.* (quoting *Buckley*, 424 U.S. at 64). FCPA's compelled registration and

disclosure requirements have been upheld by state and federal courts many times

over the years. *See id.* at 497-98; *State v. Evergreen Freedom Found.*, 192 Wn.2d

782, 801, 432 P.3d 805 (2019); *Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d

990, 994-95, 1005 (9th Cir. 2010) (rejecting an initiative-opponent's First

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Grocery Mfrs. Ass'n*, No. 99407-2

Amendment challenge to FCPA under the exacting scrutiny standard of *Citizens United v. FEC*, 558 U.S. 310, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010); U.S. CONST. amend. I).

We are not the only state where the voters have the power to propose and pass legislation. In 2012, Proposition 37 was presented to California voters. This proposition would have required some manufacturers to disclose whether packaged food contained genetically modified organisms (GMO). The Grocery Manufacturer's Association (GMA) and many of its member companies successfully campaigned against Proposition 37, and some received negative responses from the public for doing so.

In the wake of the Proposition 37 campaign, Washington sponsors filed Initiative 522. Like Proposition 37, this initiative would have required GMO labels on packaged food and like Proposition 37, GMA opposed it. GMA developed a campaign strategy to work against the initiative while shielding its member companies from the sort of negative public response that happened in California. As part of that campaign strategy, GMA created a segregated "Defense of Brands" strategic account that would hold and disburse contributions raised to oppose labeling requirements. GMA staffers explained that "'state GMO related spending will be identified as coming from GMA which will provide anonymity and eliminate state filing requirements for contributing members.'" Clerk's Papers

3

*State v. Grocery Mfrs. Ass'n*, No. 99407-2

(CP) at 4054 (quoting Ex. 15). Nothing in the record or briefing suggests GMA brought a declaratory judgment action under chapter 7.24 RCW to determine whether and how the FCPA would apply to its campaign work.

GMA raised more than $14 million to oppose GMO labeling efforts. GMA in turn contributed $11 million to the "No on 522" campaign from the Defense of Brands strategic account. Despite its political activities in Washington, GMA did not register as a political committee with the Public Disclosure Commission (PDC) and did not make any PDC reports until after this lawsuit was filed. In response to the suit, GMA registered "under duress" but, as of the time of trial, still had not filed all of the required reports.

The State sued, contending that GMA intentionally, flagrantly, and repeatedly violated the FCPA. GMA filed a separate lawsuit against the State for injunctive and declaratory relief, arguing that the State was unconstitutionally attempting to enforce Washington's fair campaign laws. The suits were consolidated. At summary judgment, the trial court found that GMA was a political committee subject to the FCPA and that it had broken the law by failing to register with the PDC and failing to file disclosure reports. Concluding there were factual issues about whether GMA had intentionally violated the law (which would permit statutory punitive treble damages), the judge reserved the penalty for trial.

*State v. Grocery Mfrs. Ass'n*, No. 99407-2

After a bench trial, the trial court found that GMA had intentionally violated Washington's campaign finance laws. It found that GMA and its board intended to use the Defense of Brands account "to shield the contributions made from GMA members from public scrutiny" and to "eliminate the requirement and need to publicly disclose GMA members' contributions on state campaign finance disclosure reports." CP at 4059. It also concluded that GMA concealed the amount and source of contributions, registered 224 days late, and did not properly or timely file at least 47 reports. The trial court specifically rejected testimony from GMA officers that they had not intended to violate the law, finding "it is not credible that GMA executives believed that shielding GMA's members as the true source of contributions to GMA's Defense of Brands Account was legal." CP at 4068.

The State asked for a base penalty of $14,622,820 based largely on the amount of campaign funds that GMA had collected and concealed. Basing the penalty on the amount intentionally concealed is explicitly authorized in the FCPA. RCW 42.17A.750(1)(g). The State also asked the trial judge to impose punitive treble damages for a total of $43,868,460, which is also explicitly authorized under the act. RCW 42.17A.780. GMA asked for "a [m]odest, [p]artially [s]uspended, [p]enalty." CP at 3476.

*State v. Grocery Mfrs. Ass'n*, No. 99407-2

The trial court rejected both approaches. It entered several relevant

unchallenged findings of fact:

106.  In exercising its discretion in determining an appropriate penalty in this case, the court should and did review the applicable statutes, administrative code provisions, case law and penalties imposed by other courts.  Although the court would not allow testimony or argument on penalties in other cases, the court has reviewed all of the briefing submitted, including GMA's briefing and arguments regarding penalties imposed in other cases.  The court has considered all of that in making its determination regarding a penalty.

107. Mitigating factors in this case include lack of any prior violations by GMA, that GMA is not a repeat violator and that GMA cooperated with the PDC once this case was filed. Those factors weigh in favor of a smaller penalty.

108. There are also factors that weigh in favor of the court imposing a more substantial penalty, including trebling of damages. Those factors include: violation of the public's right to know the identity of those contributing to campaigns for or against ballot title measures on issues of concern to the public, the sophistication and experience of GMA executives, the failure of GMA executives to provide complete information to their attorneys, the intent of GMA to withhold from the public the true source of its contributors against Initiative 522, the large amount of funds not reported, the large number of reports filed either late or not at all, and the lateness of the eventual reporting just shortly before the 2013 election.

CP at 4069.

Based on these aggravating and mitigating factors, and based on former

RCW 42.17A.750(1)(f) (2013),[1] the trial court imposed a $6 million base penalty.

---

[1] Former RCW 42.17A.750(1)(f) (2013) has been recodified without change at RCW 42.17A.750(1)(g). LAWS OF 2018, ch. 304, § 12.  For convenience, we will refer to the current code provision unless otherwise noted.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Grocery Mfrs. Ass'n*, No. 99407-2

Since the violation was intentional, the trial court imposed treble damages. *See*

RCW 42.17A.780 (allowing for punitive treble damages for intentional violations

of FCPA). It also imposed attorney fees.

GMA appealed both liability and damages, arguing, among other things, that

it was not a political committee and that, even if it was, requiring it to register and

disclose contributions and expenditures violated Washington's campaign financing

laws and several constitutional provisions. *State v. Grocery Mfrs. Ass'n*, 195

Wn.2d 442, 454, 461, 461 P.3d 334 (2020) (*GMA* II). The Court of Appeals

affirmed the trial court's decision that GMA was a political committee subject to

FCPA and that FCPA was constitutionally applied, but it found that treble damages

were inappropriate under the act. *State v. Grocery Mfrs. Ass'n,* 5 Wn. App. 2d

169, 176-77, 209, 425 P.3d 927 (2018) (*GMA* I) (citing former RCW

42.17A.765(5) (2010)). *GMA* I did not reach GMA's argument that the penalty

violated the excessive fines clauses of the state and federal constitutions. *Id.* at 177

n.2.

This court largely affirmed the trial court, holding that Washington's

campaign finance laws were constitutional as applied to GMA, that the trial court

had applied the correct standard to determine whether GMA had intentionally

violated the law, and that treble damages were permissible under the statute. *GMA*

II, 195 Wn.2d at 448-49. We remanded the case to the Court of Appeals to

*State v. Grocery Mfrs. Ass'n*, No. 99407-2

consider whether the penalty was based on constitutionally permissible

considerations and whether it violated the excessive fines clauses. *Id.* at 449. On

remand, the Court of Appeals affirmed the constitutionality of the penalty. *State v.*

*Grocery Mfrs. Ass'n*, 15 Wn. App. 2d 290, 294, 475 P.3d 1062 (2020). We

granted review. Order, No. 99407-2. Amici briefs in support of GMA have been

filed by the Building Industry Association of Washington (joined by Enterprise

Washington, Washington Farm Bureau, Washington Retail Association, National

Electrical Contractors Association, and Washington Food Industry Association)

(BIAW), the Institute for Free Speech, and the National Association of

Manufacturers (joined by the Chamber of Commerce of the United States of

America). Seven current and former Washington State legislators (CFWSL) have

filed an amici brief urging the court to adopt additional factors when considering

whether a penalty that has potential First Amendment implications violates the

excessive fines clause and urging the court to consider the impact of recent

legislation on this case.

*State v. Grocery Mfrs. Ass'n*, No. 99407-2

ANALYSIS

A. EXCESSIVE FINES

Both the Eighth Amendment to the United States Constitution and article I, section 14 of the Washington Constitution prohibit excessive fines.[2] This limitation on the government's power to punish arose from the backlash against the heavy fines levied by English kings and their judges to raise revenue and to punish the king's enemies for their political disagreements. *Browning-Ferris Indus. of Vt, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 267, 109 S. Ct. 2909, 106 L. Ed. 2d 219 (1989) (citing LOIS G. SCHWOERER, THE DECLARATION OF RIGHTS, 1689, at 91-92 (1981)). The prohibition on excessive fines was part of the 1689 English Bill of Rights. *Id.* at 266-67. Under the excessive fines clauses, "[p]unitive fines should not be sought or imposed 'to retaliate against or chill the speech of political enemies' or as 'a source of revenue.'" *GMA* II, 195 Wn.2d at 476 (internal quotation marks omitted) (quoting *Timbs v. Indiana*, 586 U.S.___, 139 S. Ct. 682, 689, 203 L. Ed. 2d 11 (2019)).

GMA argues that both the $6 million base penalty and the treble damages are unconstitutional excessive fines. It argues it should be fined, at most, $622,800

---

[2] While GMA has raised article I, section 14, it has devoted no separate argument to it. Accordingly, we will not consider whether a different result would be compelled under an independent state constitutional analysis. *See Saunders v. Lloyd's of London*, 113 Wn.2d 330, 345, 779 P.2d 249 (1989) (declining to reach arguments unsupported by sufficient argument and authority).

*State v. Grocery Mfrs. Ass'n*, No. 99407-2

based on a per-day/per-violation theory. Suppl. Br. of Pet'r GMA at 3 (citing RCW 42.17A.725(1)(c) and (d) [3]). The trial court rejected this argument and instead based the penalty on the amount of money intentionally concealed in violation of the act as authorized by RCW 42.17A.750(1)(g). The trial court reduced the penalty in recognition of the mitigating factors and then trebled it as punitive damages.

The United States Supreme Court has stressed two overarching principles in its articulation of the proper analytical test for whether a fine is excessive. "The first . . . is that judgments about the appropriate punishment for an offense belong in the first instance to the legislature." *United States v. Bajakajian*, 524 U.S. 321, 336, 118 S. Ct. 2028, 141 L. Ed. 2d 314 (1998) (citing *Solem v. Helm*, 463 U.S. 277, 290, 103 S. Ct. 3001, 77 L. Ed. 2d 637 (1983)). The second principle is "that any judicial determination regarding the gravity of a particular criminal offense will be inherently imprecise." *Id.* To show appropriate respect to both principles, the Court held that a fine is excessive "if it is grossly disproportional to the gravity of a defendant's offense." *Id.* at 334.

---

[3] The citation to RCW 42.17A.725 is likely a scrivener's error on GMA's part. A section .725 does not appear in current or former versions of the FCPA. See chapters 42.17A and 42.17 RCW dispositions at https://app.leg.wa.gov/rcw/dispo.aspx?cite=42.17A and https://app.leg.wa.gov/rcw/dispo.aspx?cite=42.17. We assume GMA meant RCW 42.17A.750, which governs penalties.

*State v. Grocery Mfrs. Ass'n*, No. 99407-2

*Bajakajian* identified four factors to determine whether a fine is grossly disproportional: "'(1) the nature and extent of the crime, (2) whether the violation was related to other illegal activities, (3) the other penalties that may be imposed for the violation, and (4) the extent of the harm caused.'" *GMA* II, 195 Wn.2d at 476 (quoting *United States v. $100,348.00 in U.S. Currency*, 354 F.3d 1110, 1122 (9th Cir. 2004)). We also consider the individual's ability to pay the fine. *City of Seattle v. Long*, 198 Wn.2d 136, 173, 493 P.3d 94 (2021).

Whether a penalty is grossly disproportional is reviewed de novo. *Bajakajian*, 524 U.S. at 336-37. Courts apply the *Bajakajian* analysis to punitive civil fines. *See Long*, 198 Wn.2d at 163.

(1) NATURE AND EXTENT OF THE OFFENSE. The State contends GMA "perpetrated the largest campaign finance violation in Washington's history, intentionally concealing the true source of over $10 million in campaign spending" and directly violating the core principles of the FCPA. State's Suppl. Br. at 1. GMA contends it merely committed "a commonplace FCPA violation." Suppl. Br. of Pet'r GMA at 11. We agree with the State's characterization of the nature and extent of the offense.

Again, it is the public policy of the state of Washington:

> (1) That political campaign and lobbying contributions and expenditures be fully disclosed to the public and that secrecy is to be avoided.

11

*State v. Grocery Mfrs. Ass'n*, No. 99407-2

. . . .

(10) That the public's right to know of the financing of political campaigns and lobbying and the financial affairs of elected officials and candidates far outweighs any right that these matters remain secret and private.

(11) That, mindful of the right of individuals to privacy and of the desirability of the efficient administration of government, full access to information concerning the conduct of government on every level must be assured as a fundamental and necessary precondition to the sound governance of a free society.

The provisions of this chapter shall be liberally construed to promote complete disclosure of all information respecting the financing of political campaigns.

RCW 42.17A.001. Washington voters, by initiative, have firmly established that they have the right to know who is paying for political campaigns, including initiatives, in this state. *Id.* The voters and the integrity of the electoral process are harmed when that right is violated, especially when that information is intentionally concealed. *Id.* As the Ninth Circuit Court of Appeals observed when rejecting a challenge to the FCPA, "'[t]he people in our democracy are entrusted with the responsibility for judging and evaluating the relative merits of conflicting arguments. They may consider, in making their judgment, the source and credibility of the advocate.'" *Human Life*, 624 F.3d at 994 (quoting *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 791-92, 98 S. Ct. 1407, 55 L. Ed. 2d 707 (1978)).

*State v. Grocery Mfrs. Ass'n*, No. 99407-2

In this case, the trial court's unchallenged findings of fact underscore the harm caused when campaign contributions are concealed. It found these factors that weighed in favor of a significant penalty:

> violation of the public's right to know the identity of those contributing to campaigns for or against ballot title measures on issues of concern to the public, the sophistication and experience of GMA executives, the failure of GMA executives to provide complete information to their attorneys, the intent of GMA to withhold from the public the true source of its contributors against Initiative 522, the large amount of funds not reported, the large number of reports filed either late or not at all, and the lateness of the eventual reporting just shortly before the 2013 election.

CP at 4069. Since GMA did not challenge this finding, it is a verity on appeal. *See* Opening Br. of Appellant at 1-2 (Wash. Ct. App. No. 49768-9-II (2017)); *In re Dependency of MSR*, 174 Wn.2d 1, 9, 271 P.3d 234 (2012) (citing *State v. Rankin*, 151 Wn.2d 689, 709, 92 P.3d 202 (2004)). These factors show the nature of the offense was grave and the extent was broad.

GMA attempts to analogize the nature and extent of the offense here to the one before the Court in *Bajakajian*. We do not find the two offenses analogous. *Bajakajian* concerned the violation of federal statutes that require people to report if they are taking more than $10,000 in cash out of the country and required forfeiture of the cash as a penalty. 524 U.S. at 324 (citing 18 U.S.C. § 982(a)(1)). Hosep Bajakajian had attempted to leave the country carrying about $360,000 in cash to pay a lawful debt. *Id.* at 324, 326. The cash was not connected to any other

13

*State v. Grocery Mfrs. Ass'n*, No. 99407-2

crime. *Id.* at 326. The Supreme Court found that forfeiting the entire amount of cash violated the excessive fines clause because it was grossly disproportional to the gravity of Bajakajian's offense. *Id.* at 337.

On a facile level, both the crime in *Bajakajian* and the violation of campaign laws could be described as reporting offenses. But GMA's decision to conceal the identities of its campaign contributors struck at the core of open and transparent elections. Under the FCPA, voters have the right to "know of the financing of political campaigns," RCW 42.71A.001(10), and "'may consider, in making their judgment, the source and credibility of the advocate,'" *Human Life*, 624 F.3d at 994 (quoting *Bellotti*, 435 U.S. at 791-92). By contrast, Bajakajian's failure to report "affected only one party, the Government, and in a relatively minor way. There was no fraud on the United States, and respondent caused no loss to the public fisc. Had his crime gone undetected, the Government would have been deprived only of the information that $357,144 had left the country." *Bajakajian*, 524 U.S. at 339. Bajakajian's offense was minor. The GMA's offense struck at the core of open elections. The grave nature and broad extent of GMA's offense suggests the penalty is not grossly disproportional.[4]

---

[4] For these reasons, we respectfully disagree with the dissent's suggestion that the federal currency reporting statutes at issue in *Bajakajian* are meaningfully analogous to the FCPA, or that GMA's offense should be treated merely as a reporting offense. The federal statutes simply required reporting to allow the federal government to know when large amounts of currency were being moved outside of our borders. Our FCPA, by contrast, is designed to allow voters to make informed choices about candidates and ballot measures. The amount concealed is directly

*State v. Grocery Mfrs. Ass'n*, No. 99407-2

(2) WHETHER THE VIOLATION WAS RELATED TO OTHER ILLEGAL ACTIVITIES.

GMA characterizes itself as being punished for a unified course of conduct.

Without specific citation to *Bajakajian*, GMA argues that "*Bajakajian* requires

examining whether the conduct in question relates to *other* illegal activity, not

whether it violates multiple laws." Suppl. Br. of Pet'r GMA at 13. Since, GMA

contends, it "spent lawfully acquired funds on core political speech, a lawful—

indeed, a constitutionally protected—activity," this factor weighs against a

significant penalty. *Id.*

*Bajakajian* offers at best weak support for GMA's argument that its

violations were not related to other illegal activity. Bajakajian pleaded guilty to

failing to report as required by 31 U.S.C. § 5316(a)(1)(A). *Bajakajian*, 524 U.S. at

325. The court observed that Bajakajian did "not fit into the class of persons for

whom the statute was principally designed: He is not a money launderer, a drug

trafficker, or a tax evader," and he could have lawfully carried the whole amount

out of the country if he had reported it. *Id.* at 337-38. *Bajakajian* does not address

---

correlated to the harm caused because GMA was able to fund more campaign speech without the
proper disclosure than if it had concealed less money. The federal and state statutes are also not
analogous because the federal law required forfeiture of the whole amount. *Bajakajian*, 524 U.S.
at 326 (citing 18 U.S.C. § 982(a)(1)). By contrast, the FCPA allows only a fine based on the
amount concealed if the trial judge determines, given the facts of the individual case, such a fine
is warranted. RCW 42.17A.750, .780. Nothing in *Bajakajian* prohibits the court from
considering the harm caused to the integrity of an election when a political committee willfully
conceals the source of campaign contributions and spending.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Grocery Mfrs. Ass'n*, No. 99407-2

whether "other illegal activities" had to be found in a separate chapter of statutory law.

GMA's conduct involved several illegal activities that together amounted to failing to register and intentionally concealing the true source of donations. That is exactly the conduct the FCPA was designed to prevent. The currency statutes that Bajakajian violated were not designed to catch people who were merely taking cash to pay a lawful debt. *See id.* at 337-38. While this factor does not weigh as strongly as the others, it supports a conclusion that the penalty is not grossly disproportional.[5]

(3) THE OTHER PENALTIES THAT MAY BE IMPOSED FOR THE VIOLATION. A base penalty of the amount concealed has always been a potential statutory penalty under FCPA. LAWS OF 1973, ch. 1, § 39(1)(e), currently codified as RCW 42.17A.750(1)(g). The FCPA has always authorized trial judges to impose treble damages for intentional violations of our state's campaign disclosure laws. LAWS OF 1973, ch. 1, § 40(5); RCW 42.17A.780.

---

[5] We respectfully disagree with the dissent that anything in *Bajakajian* prevents the trial judge from considering the policy considerations underlying the FCPA when setting the penalty. Nothing in *Bajakajian* limits the trial court to the elements of the offense when setting the penalty. Unlike in the criminal setting, the Supreme Court has never required that the State charge and prove beyond a reasonable doubt the facts on which a civil penalty may be based. Additionally, the *Bajakajian* court noted that Bajakajian "does not fit into the class of persons for whom the statute was principally designed: He is not a money launderer, a drug trafficker, or a tax evader." 524 U.S. at 338. Here, by contrast, the GMA fits precisely into the class for whom this statute was principally designed—candidates and political action committees.

*State v. Grocery Mfrs. Ass'n*, No. 99407-2

GMA suggests that the fact the legislature authorized lesser penalties shows that this fine was grossly disproportionate. GMA stresses that if the trial judge had imposed the maximum per-violation/per-day penalties set forth in RCW 42.17A.750(1)(c) and (e), it would be subject to a $622,820 penalty. Trebled, that penalty would be about $1.87 million. But courts look to all the penalties, *especially* the maximum penalties, authorized by the legislature. *$100,348.00 in U.S. Currency*, 354 F.3d at 1122 (citing *United States v. 3814 NW Thurman St.*, 164 F.3d 1191, 1197 (9th Cir. 1999)); *Bajakajian*, 524 U.S. at 338. GMA's argument ignores this case law.

RCW 42.17A.750(1)(g) authorizes a civil penalty equal to the amount concealed. RCW 42.17A.780 authorizes treble damages for intentional violations—here, more than $43 million dollars. This factor strongly suggests the $18 million fine was not grossly disproportional.

(4) THE EXTENT OF THE HARM CAUSED. GMA argues that concealing its contributors caused minimal harm because voters knew that grocery manufacturers opposed the initiative. But the harm was substantial and struck at the heart of the principles embodied in the FCPA. *See* RCW 42.17A.001. Voters are entitled to know who is contributing to political committees and paying for political campaigns by name, not just by category. *Id.*

17

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Grocery Mfrs. Ass'n*, No. 99407-2

GMA contends that "[t]o assume a one-to-one ratio between the amount of funds involved and resulting harm is to repeat the error of the district court in *Bajakajian*." Suppl. Br. of Pet'r GMA at 15. But it points to no error committed by the district court in *Bajakajian*. The federal district court rejected the government's attempt to seize the entire amount of currency Bajakajian attempted to take from the country without reporting. *Bajakajian*, 524 U.S. at 326. Both the Court of Appeals and the United States Supreme Court affirmed that judgment. *Id.* at 327, 344. Nothing in *Bajakajian* suggests that forfeiture would not have been constitutionally appropriate had the crime been more than a mere reporting violation.

GMA also suggests that the reporting requirements of the FCPA have less force in the context of initiatives because there is no risk of quid pro quo corruption. But both this court and the Ninth Circuit have found that the public's interest in disclosure of campaign contributions "apply equally for voter-decided ballot measures." *Evergreen Freedom Found.*, 192 Wn.2d at 799 (citing *Human Life*, 624 F.3d at 1006. Plainly, the drafters of Initiative 276, which created the FCPA, were aware initiatives existed and could have imposed a lesser penalty for failing to properly report spending on initiative campaigns. Nonetheless, the initiative did not create a separate penalty structure.

18

*State v. Grocery Mfrs. Ass'n*, No. 99407-2

Finally, GMA argues that the trial court assumed the harm caused by the failure to report was the same as the amount of donations it failed to report. But it is the judgment of the people that this penalty is appropriate in these type of cases. LAWS OF 1973, ch. 1, § 39(1)(e), currently codified as RCW 42.17A.750(1)(g). *Bajakajian* instructs us to give considerable deference to the legislature's judgment on damages. 524 U.S. at 336 (citing *Solem*, 463 U.S. at 290). Washington voters determined that treble damages for intentional violations of the FCPA were appropriate, and that judgment has been endorsed by our legislature many times since. LAWS OF 1973, ch. 1, § 40(5); RCW 42.17A.780. This factor strongly suggests the penalty is not grossly disproportional.[6]

Under the two principles and four factors identified in *Bajakajian*, this penalty is not grossly disproportional to GMA's conduct.

(5) ADDITIONAL ISSUES. GMA seems to suggest that the penalty is grossly disproportional because it is larger than the penalties imposed on other candidates and political committees. *See* Suppl. Br. of Pet'r GMA at 5, App. A-1 (demonstrating graphically that it received a large fine in comparison to other

---

[6] Amicus CFWSL suggests that there was no harm here because the State did not attempt to show GMA's failure to disclose affected the outcome of the election or prevented a voter from being able to determine the financial support for the "No on Initiative 522" campaign. Br. of Amici Curiae CFWSL at 5-6. But the FCPA specifically recognizes the harm caused by concealing the source of campaign funding regardless of whether that concealment changed the outcome of the election. *See* RCW 42.17A.001.

*State v. Grocery Mfrs. Ass'n*, No. 99407-2

violators). But *Bajakajian*'s test analyzes whether the penalty is grossly disproportional to the defendant's bad *conduct.* It does not analyze whether the penalty is disproportional to the one imposed in other (and in this case, starkly dissimilar) cases. Other legal doctrines, like equal protection of the law, constrain the State from treating similar cases differently based on impermissible characteristics. *See United States v. Batchelder*, 442 U.S. 114, 125 n.9, 99 S. Ct. 2198, 60 L. Ed. 2d 755 (1979) ("The Equal Protection Clause prohibits selective enforcement 'based upon an unjustifiable standard such as race, religion, or other arbitrary classification.'" (quoting *Oyler v. Boles*, 368 U.S. 448, 456, 82 S. Ct. 501, 7 L. Ed. 2d 446 (1962))). GMA has not raised an equal protection claim.[7]

GMA also suggests that it has been treated differently from other political committees and candidates who have violated Washington's fair campaign laws. It has not shown the factual predicate for this argument. GMA received a large penalty because it intentionally concealed the source of a large amount of contributions. It does not bring to our attention any other candidate or political committee that intentionally concealed a remotely similar amount of campaign contributions. The fact that other political campaigns and candidates received

---

[7] Equal protection of the law prohibits the State from bringing charges "'deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.'" *State v. Judge*, 100 Wn.2d 706, 713, 675 P.2d 219 (1984) (quoting *Oyler*, 368 U.S. at 456). GMA has not squarely brought a selective prosecution claim, though we acknowledge the extent to which the doctrine applies against the FCPA is unsettled.

*State v. Grocery Mfrs. Ass'n*, No. 99407-2

smaller penalties for negligently concealing smaller amounts of money than GMA intentionally concealed does not make the penalty here disproportionate. GMA makes no meaningful effort to show its misconduct is comparable to the misconduct of those who received smaller penalties.

Several of the amici ask us to adopt additional factors to the *Bajakajian* analysis. Based on the arguments before the court, we decline to do so. Amici CFWSL argues that courts should either "rigorously analyz[e] evidence related to the violation at hand or . . . carefully compar[e] the violation in question to other, previously-adjudicated violations" before imposing a penalty. Br. of Amici Curiae CFWSL at 4. But while the penalty imposed in other cases might certainly be relevant to the trial court's determination of the appropriate penalty, the question here is whether the penalty imposed is grossly disproportional to the defendant's bad *conduct*, not whether the penalty is different from the one imposed in different cases—especially when, as here, the cases are starkly dissimilar. CFWSL also makes no attempt to show that analyzing these two factors would have led to a different result in this case.

Similarly, amici BIAW asks us to adopt a rule that trial courts must specifically consider the risk of chilling speech and the risk of selective prosecution in determining the proper penalty. But neither factor helps us determine whether this penalty is disproportional to this conduct.

21

*State v. Grocery Mfrs. Ass'n*, No. 99407-2

Amici National Association of Manufacturers argue that this fine is grossly disproportional under *Americans for Prosperity Foundation v. Bonta*, 594 U.S. ___, 141 S. Ct. 2373, 210 L. Ed. 2d 716 (2021). Relatedly, amicus the Institute for Free Speech argues that the penalty itself, and not just the FCPA as a whole, must survive the exacting scrutiny test under *Bonta*. But *Bonta* concerned the constitutionality of a regulatory scheme, not the constitutionality of a penalty for violating a constitutional regulatory scheme. *See Bonta*, 141 S. Ct. at 2383. Neither amici suggests a principled way to apply exacting scrutiny to punishments.

We hold that the penalty imposed here was not grossly disproportional to the offense under the Eighth Amendment.

## B. FIRST AMENDMENT ARGUMENTS

GMA raises a number of First Amendment challenges to the penalty imposed here. We find none of them persuasive.

First, GMA asserts that the penalty here is the product of viewpoint discrimination because the State did not seek to prove Food Democracy Action! (Food Democracy) intentionally violated FCPA, which would have made it potentially subject to treble damages. GMA does not, however, show that the State could have shown that Food Democracy intentionally violated the act or offer any evidence that the State was motived by viewpoint discrimination. Accordingly, the factual predicate for its argument is not established.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Grocery Mfrs. Ass'n*, No. 99407-2

Briefly, Food Democracy solicited and received almost $300,000 in donations from 7,000 people to support Initiative 522. *State ex rel. Pub. Disclosure Comm'n v. Food Democracy Action!*, 5 Wn. App. 2d 542, 544, 427 P.3d 699 (2018). It donated $200,000 to the "Yes on Initiative 522" campaign under its own name. *Id.* at 545. Food Democracy did not register with the PDC until the PDC opened an investigation. *Id.* at 544. It did not appear for trial. *Id.* at 547. The trial proceeded without it, and the State presented its case that Food Democracy had violated the act, but the State did not seek to prove the violation was intentional. *Id.* The trial court found that Food Democracy had violated the FCPA and penalized Food Democracy the amount it had failed to disclose plus $1,000 for each of the 18 reports it had filed late for about $320,000. *Id.* The Court of Appeals affirmed. *Id.* at 544.

Nothing in the *Food Democracy* opinion, briefing, or record called to our attention suggests the State could have established Food Democracy designed a campaign strategy that intentionally violated the FCPA. The briefing describes the Food Democracy as "a two-employee, Iowa-based organization with no prior experience in Washington politics." Opening Br. of Appellant Food Democracy Action at 1 (Wash. Ct. App. No. 49932-1-II (2017)). Food Democracy admitted the violation but consistently denied it was intentional. There is nothing in the record that suggests Food Democracy intentionally designed its campaign strategy

23

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Grocery Mfrs. Ass'n*, No. 99407-2

around shielding its 7,000 small donors. At most, the *Food Democracy* opinion shows that by two weeks before the election, Food Democracy knew it would have to disclose information about campaign contributors and asked contributors to include that information with their donations. 5 Wn. App. 2d at 545 (quoting from a copy of a fundraising e-mail sent by Food Democracy). This is simply not comparable to the misconduct in the case before us.

There is also nothing in the State's penalty arguments in the two cases that suggests viewpoint discrimination. The State proposed the same statutory formula for damages in both cases. *See* CP at 3453-54; Br. of Resp't State of Wash. at 14 (Wash. Ct. App. No. 49932-1-II (2017)). The result was different because the base amount concealed was different and because the State proved GMA intentionally violated the FCPA.[8]

---

[8] Relatedly, GMA argues that "[t]he trial court did not consider penalties in other cases." Suppl. Br. of Pet'r GMA at 5. This assertion overlooks unchallenged finding of fact 106, which says the trial court did consider "GMA's briefing and arguments regarding penalties imposed in other cases. The court has considered all of that in making its determination regarding a penalty." CP at 4069. GMA did not assign error to this finding of fact. Opening Br. of Appellant at 1-2 (Wash. Ct. App. No. 49768-9-II (2017)). Accordingly, the fact the trial judge *did* consider penalties levied in the other cases brought to its attention is a verity on appeal. *MSR*, 174 Wn.2d at 9 (citing *Rankin*, 151 Wn.2d at 709. Similarly, GMA challenges the fact that the trial court did not consider the factors that guide the PDC in assessing penalties for violations of the FCPA. Suppl. Br. of Pet'r GMA at 5; *see* WAC 390-37-182 (listing factors the PDC has promulgated for itself to consider in imposing a penalty). But the trial court found in an unchallenged finding of fact that "the court should and did review . . . administrative code provisions . . . [and] considered all of that in making its determination regarding a penalty." CP at 4069. This unchallenged fact is a verity on appeal. *MSR*, 174 Wn.2d at 9 (citing *Rankin*, 151 Wn.2d at 709). GMA is not entitled to challenge that finding of fact here.

*State v. Grocery Mfrs. Ass'n*, No. 99407-2

Second, GMA argues that "[t]he fine imposed in this case violates freedom of speech and freedom of association" because "[p]unishing speakers more severely for speaking more and for opting to speak collectively through a trade association is antithetical to First Amendment values." Suppl. Br. of Pet'r GMA at 18. It has not established the factual predicates for its argument. It has not attempted to show that had each of its members who individually donated to the Defense of Brands strategic account intentionally attempted to conceal its contribution, they each would not have received a similar penalty. Nor has it shown it is being punished for "speaking more." Instead, it is being punished for intentionally violating Washington's fair campaign act. It was free to speak as much as it wished, so long as it complied with the registration and reporting requirements of the act so that Washington voters knew the source of the speech.

Third, GMA contends it cannot be subject to punitive damages under *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974). Suppl. Br. of Pet'r GMA at 20. We do not find this case helpful. Briefly, after Chicago police shot and killed a young man, his family hired an attorney, Gertz, to represent them in a civil suit. *Gertz*, 418 U.S. at 325. After a magazine falsely claimed that Gertz was part of a communist "'War On Police,'" among many other things, Gertz sued for defamation. *Id.* at 326-27 (quoting record). The magazine argued that it was entitled to the "actual malice" standard of *New York Times Co. v.*

25

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Grocery Mfrs. Ass'n*, No. 99407-2

*Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964), which would have required Gertz to prove the magazine published defamatory falsehoods either knowing they were false or with reckless disregard of the truth. *Id.* at 327-28 (citing *N.Y. Times*, 376 U.S. at 279-80). The United States Supreme Court declined to extend *New York Times* to publishers or broadcasters who defame private citizens. *Id.* at 345-46. It did, however, limit damages to actual damages "at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth." *Id.* at 349.

The factual predicate for GMA's reliance on *Gertz* is absent since the trial court not only found GMA intentionally violated the law, it found that "it is not credible that GMA executives believed that shielding GMA's members as the true source of contributions to GMA's Defense of Brands Account was legal." CP at 4068.[9] That is analogous to a "showing of knowledge of falsity or reckless

---

[9] We note that the trial court rejected GMA's "advice of counsel" defense and entered a conclusion of law that

> GMA either intentionally failed to provide full and accurate information to counsel when asking for advice on the legality of the Defense of Brands Account under Washington law or, alternatively, created the Account without receiving any advice that such an account was legal under Washington law. In either case, GMA does not make the required showing that it is entitled to this defense, if it even is available at all under Washington law.

CP at 4071. This is the one conclusion of law GMA did not challenge on appeal. Opening Br. of Appellant at 2 (Wash. Ct. App. No. 49768-9-II (2017)). This further illustrates that GMA is not substantially similar to the publisher in *Gertz*.

26

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

disregard for the truth." *Gertz*, 418 U.S. at 349.  *Gertz* does not suggest a punitive

sanction is inappropriate under these facts.

We find none of these challenges availing.

C. REMAINING ISSUES

GMA complains that the trial court did not explain why it imposed a $6

million dollar base penalty rather than the $14 million sought by the State or some

other amount.  But while the trial court did not offer a mathematical explanation, it

did enter a 24-page findings of fact and conclusions of law that listed the

aggravating and mitigating factors. GMA does not point to any authority that

would require the trial court to do more.

GMA complains that the trial court "disregarded GMA's reference in its trial

brief to the standard of gross disproportionality [and] denied summarily GMA's

post-trial motion to conform the judgment to the Eighth Amendment."  Suppl. Br.

of Pet'r GMA at 7-8.  But only one footnote of GMA's 25-page trial brief

addressed disproportionality, and it did so in a conclusory way.  It said:

> A civil penalty also must be "supported by the record," "cogent," and—to
> avoid an Eighth Amendment violation—cannot be "grossly disproportional
> to the gravity of the defendant's offense." *State v. WWJ Corp.*, 88 Wn. App.
> 167, 175[, 941 P.2d 717] (1997), modified and affirmed on other grounds,
> 138 Wash. 2d 595, 603-604 (1999). *See also* Wn. Const., art. I, § 14; *State v.*
> *Witherspoon*, 171 Wn. App. 271, 301[, 980 P.2d 1257] (2012) [(plurality
> opinion)], aff'd, 180 Wn.2d 875, 329 P.3d 888 (2014), as corrected (Aug.
> 11, 2014) (describing the Washington Constitution's limits on "grossly

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Grocery Mfrs. Ass'n*, No. 99407-2

disproportionate" penalties); *Wahleithner v. Thompson*, 134 Wn. App. 931, 936[, 143 P.3d 321] (2006) (same).

CP at 3475 n.7. That footnote is not sufficient to prompt the trial court to do a separate Eighth Amendment analysis. GMA's "Motion to Conform the Penalty Amount" was filed two months after judgment and a month after GMA filed its notice of appeal. The trial court treated it as a motion for reconsideration and rejected it as untimely without reaching the merits. GMA has not shown this was error.

Amici CFWSL call our attention to an act that passed while this case has been pending, Laws of 2018, chapter 304.[10] Among other things, chapter 304 added a list of nonexclusive factors for trial courts to consider when imposing civil penalties on violators. LAWS OF 2018, ch. 304, § 12(1)(d) (codified at RCW 42.17A.750(1)(d)).[11] Amici CFWSL ask this court to consider these factors. But it

---

[10] Chapter 304 is codified in scattered provisions of chapter 42.17A RCW. Most relevantly, the act enumerated nonexclusive factors for courts to consider in imposing civil penalties. LAWS OF 2018, ch. 304, § 12(1)(d) (codified at RCW 42.17A.750(1)(d)).

[11] These factors are

> (d) When assessing a civil penalty, the court may consider the nature of the violation and any relevant circumstances, including the following factors:
> (i) The respondent's compliance history, including whether the noncompliance was isolated or limited in nature, indicative of systematic or ongoing problems, or part of a pattern of violations by the respondent, resulted from a knowing or intentional effort to conceal, deceive or mislead, or from collusive behavior, or in the case of a political committee or other entity, part of a pattern of violations by the respondent's officers, staff, principal decision makers, consultants, or sponsoring organization;
> (ii) The impact on the public, including whether the noncompliance deprived the public of timely or accurate information during a time-sensitive period or otherwise had a significant or material impact on the public;

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Grocery Mfrs. Ass'n*, No. 99407-2

gives us no guidance on how these factors should be applied, it does not show that the legislature intended that change to apply to cases pending on appeal, and it does not attempt to show that the trial court would have come to a different conclusion had it considered those factors. Perhaps more importantly, the legislature had an opportunity to eliminate both RCW 42.17A.750(1)(g) and RCW 42.17A.780, which authorized this penalty, and it did not. This suggests the legislature as a whole still approves of a penalty based on the amount of funds that were concealed in violation of the act.

---

(iii) Experience with campaign finance law and procedures or the financing, staffing, or size of the respondent's campaign or organization;

(iv) The amount of financial activity by the respondent during the statement period or election cycle;

(v) Whether the late or unreported activity was within three times the contribution limit per election, including in proportion to the total amount of expenditures by the respondent in the campaign or statement period;

(vi) Whether the respondent or any person benefited politically or economically from the noncompliance;

(vii) Whether there was a personal emergency or illness of the respondent or member of the respondent's immediate family;

(viii) Whether other emergencies such as fire, flood, or utility failure prevented filing;

(ix) Whether there was commission staff or equipment error, including technical problems at the commission that prevented or delayed electronic filing;

(x) The respondent's demonstrated good-faith uncertainty concerning commission staff guidance or instructions;

(xi) Whether the respondent is a first-time filer;

(xii) Good faith efforts to comply, including consultation with commission staff prior to initiation of enforcement action and cooperation with commission staff during enforcement action and a demonstrated wish to acknowledge and take responsibility for the violation;

(xiii) Penalties imposed in factually similar cases; and

(xiv) Other factors relevant to the particular case.

RCW 42.17A.750.

*State v. Grocery Mfrs. Ass'n*, No. 99407-2

CONCLUSION

GMA has not shown that the trial court erred in imposing a punitive sanction under the FCPA based on the amount intentionally concealed. We affirm the courts below and remand for any further proceedings necessary and consistent with this opinion. The State's motion for attorney fees is granted.

_____
González, C.J.

WE CONCUR:

_____          _____
                                                                                          Yu, J.

_____          _____
                Owens, J.                                              Montoya-Lewis, J.

_____          _____
                                                                                          Whitener, J.

30

*State v. Grocery Mfrs. Ass'n*, No. 99407-2
(Gordon McCloud, J., dissenting)

No. 99407-2

GORDON McCLOUD, J. (dissenting)—The majority begins with the

important observation that both this court and the federal courts have upheld the

"compelled registration and disclosure requirements" of Washington's Fair

Campaign Practices Act (FCPA), ch. 42.17A RCW, "many times over the years."

Majority at 2 (citing *State v. Evergreen Freedom Found.*, 192 Wn.2d 782, 801, 432

P.3d 805, *cert. denied*, 139 S. Ct. 2647 (2019)); *Human Life of Wash. Inc. v.*

*Brumsickle*, 624 F.3d 990, 994-95 (9th Cir. 2010)). I agree, and I join the majority

in reiterating those holdings today.

The majority also reiterates that the trial court's $6 million base penalty and

trebled $18 million final penalty in this case complied with the FCPA's statutory

requirements. Majority at 7. I agree with that, also.

But the majority concludes that that substantial penalty also complies with

the Eighth Amendment. U.S. CONST. amend. VIII. I firmly disagree with that

holding. The Grocery Manufacturers Association (GMA) committed only the

regulatory violation of failing to comply with a *reporting* requirement. The FCPA

1

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Grocery Mfrs. Ass'n*, No. 99407-2
(Gordon McCloud, J., dissenting)

punishes just that—failure to report. It does not make the receipts, expenditures, or political speech that the expenditures funded illegal, and it does not punish such receipts, expenditures, or speech. Hence, under the Eighth Amendment, the penalty imposed for the FCPA violation must be proportionate to the failure to report, not to the amount of the receipts, expenditures, or speech that the expenditures funded.

The most recent, controlling United States Supreme Court precedent on precisely this point—that is, the Eighth Amendment limits of a statutory penalty for failure to report, *even where the failure to report was knowing, willful, and criminal*—is *United States v. Bajakajian*, 524 U.S. 321, 118 S. Ct. 2028, 141 L. Ed. 2d 314 (1998). *Bajakajian* clearly holds that when the transgression is a failure to report, the Eighth Amendment requires that the penalty cannot be grossly disproportionate *to the failure to report*. Measuring the penalty by the amount that was unreported does not achieve that constitutionally required proportionality. Following that logic, the penalty assessed in this case is even less proportionate than the forfeiture sought in *Bajakajian*: the $6 million base penalty here is far higher than the $357,144 of unreported funds that the government sought in *Bajakajian*; the trebling of that $6 million to $18 million makes that penalty even less proportionate to the violation than the penalty sought in *Bajakajian*; and the

2

*State v. Grocery Mfrs. Ass'n*, No. 99407-2
(Gordon McCloud, J., dissenting)

$18 million penalty was imposed for a violation that was civil and regulatory, not

criminal and felonious as in *Bajakajian.*

The $18 million statutory penalty in this case therefore violates the Eighth

Amendment just as much as a $357,144 statutory penalty would have violated the

Eighth Amendment in *Bajakajian*. I therefore respectfully dissent.

ANALYSIS

I.      *Bajakajian* holds that when the unlawful conduct is a failure to report, the
        Eighth Amendment bars the trial court from imposing a penalty that is
        grossly disproportionate to the failure to report—not to some other
        unadjudicated conduct

31 U.S.C. § 5316(a)(1)(A) requires a person to "report" when they are

transporting more than $10,000 outside of the United States. Specifically, that

reporting statute provides:

> (a) Except as provided in subsection (c) of this section, a
> person… *shall file a report* under subsection (b) of this section when
> the person, agent, or bailee knowingly—
>> (1) transports, is about to transport, or has transported,
> monetary instruments of more than $10,000 at one time—
>>> (A) from a place in the United States to or through a
> place outside the United States . . . .

31 U.S.C. § 5316 (emphasis added). Under 31 U.S.C. § 5322(a), a "willful[]"

violation of this "knowing" failure to report statute carries a fine of "not more than

$250,000, or imprison[ment] for not more than five years, or both." A separate

3

*State v. Grocery Mfrs. Ass'n*, No. 99407-2
(Gordon McCloud, J., dissenting)

criminal statute requires the trial court to forfeit the entire amount "involved in such offense." 18 U.S.C. § 982(a)(1).[1]

Hosep Bajakajian attempted to board a plane leaving the United States. A customs inspector approached him and his wife and told them that they were required to report all money in excess of $10,000 in their possession or in their baggage. *Bajakajian*, 524 U.S. at 324. Bajakajian responded that he was carrying $8,000 and his wife had another $7,000, but that they had no other currency to declare. *Id.* at 324-25. The customs inspectors, however, found $357,144 in currency that Bajakajian was carrying, much of it in a false-bottomed piece of luggage. *Id.* at 325, 353 (Kennedy, J., dissenting)[2]; *United States v. Bajakajian*, 84 F.3d 334, 335 (9th Cir. 1996), *aff'd*, 524 U.S. 321(1998).

The government charged Bajakajian with three felonies: "willfully" failing to report that he was transporting more than $10,000 outside the United States in

---

[1] "The court, in imposing sentence on a person convicted of an offense in violation of section . . . 5316, . . . shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." Former 18 U.S.C. § 982(a)(1) (1990).

[2] The facts in that case were not in dispute, but their significance was. *See Bajakajian*, 524 U.S. at 353 (Kennedy, J., dissenting) ("The majority ratifies the District Court's see-no-evil approach. The District Court ignored respondent's lies in assessing a sentence.").

4

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Grocery Mfrs. Ass'n*, No. 99407-2
(Gordon McCloud, J., dissenting)

violation of 31 U.S.C. §§ 5316(a)(1)(A) and 5322(a),[3] making a material false statement to the United States Customs Service in violation of 18 U.S.C. § 1001, and for criminal forfeiture of the entire $357,144 pursuant to 18 U.S.C. § 982(a)(1). *Id.* at 325. The federal district court convicted Bajakajian of failing to report, but it concluded that the statute at issue was a reporting statute and that full forfeiture of the nonreported currency would violate the excessive fines clause of the Eighth Amendment. *Id.* at 326. The Ninth Circuit Court of Appeals affirmed. *Id.* The United States Supreme Court agreed and held that forfeiture of the amount the government sought—that is, the entire amount that Bajakajian failed to report—would have violated the excessive fines clause because it was "grossly disproportional to the gravity of [the] defendant's offense." *Id*. at 334.

The statute in this case is the same type of reporting statute as the statute at issue in *Bajakajian*. GMA violated the FCPA.[4] Specifically, the trial court ruled—

---

[3] To violate section 5316(a)(1)(A) the person must have "knowledge" that they are transporting over $10,000 in currency out of the United States—but the statute does not require affirmative knowledge of the need to report. However, section 5322(a) creates higher penalties if the person "willfully" fails to report. Bajakajian was alerted to the need to report by the customs inspector and chose not to do so. Therefore, the government charged him with, and he pleaded guilty to, a willful violation. *Bajakajian*, 524 U.S. at 325.

[4] The trial court found, and we affirmed, that GMA committed five violations of the FCPA, based on four separate provisions. *State v. Grocery Mfrs. Ass'n*, 195 Wn.2d 442, 451, 477, 461 P.3d 334 (2020). The violations were

5

*State v. Grocery Mfrs. Ass'n*, No. 99407-2
(Gordon McCloud, J., dissenting)

and this Court affirmed—that GMA violated the mandatory *reporting* provision of

the FCPA:

> (1) In addition to the information required under RCW 42.17A.205
> and 42.17A.210, on the day the treasurer is designated, each
> candidate or political committee must file with the commission *a
> report of all contributions received and expenditures made* prior to
> that date, if any.

Former RCW 42.17A.235(1) (2018) (emphasis added).

The statute in this case also carries the same kind of severe penalties for

intentional failures to report that the statutes in *Bajakajian* carried for willful

failures to report. Former RCW 42.17A.765(5) (2010). And the trial court followed

the FCPA statute: it determined GMA's fine by starting with the amount that GMA

failed to report—$11 million.[5] RCW 42.17A.750(1)(e); former RCW

---

> "a. Failing to timely register with the Public Disclosure Commission as a
>     political committee in violation of RCW 42.17A.205;
> "b. Failing to timely identify a treasurer and [bank] account in violation
>     of RCW 42.17A.205;
> "c. Failing to timely and regularly disclose contributions it received from its
>     members in the Defense of Brands Account in violation of RCW
>     42.17A.235;
> "d. Failing to timely and regularly disclose expenditures it made from the
>     Defense of Brands Account in violation of RCW 42.17A.240; and
> "e. Concealing the true sources of the contributions it received and
>     expenditures it made in opposing Initiative 522[]"

in violation of RCW 42.17A.435. *Id.* (footnote omitted).

[5] The trial court based this fine *specifically* on GMA's failure to report:

*State v. Grocery Mfrs. Ass'n*, No. 99407-2
(Gordon McCloud, J., dissenting)

42.17A.765(5); Majority at 6-7. The trial court then reduced that fine because it found significant mitigating factors—imposing a base penalty of $6 million. Clerk's Papers (CP) at 4072. Finally, the trial court trebled that base penalty because it found that GMA acted intentionally. *Id.* The trial court ultimately fined GMA $18 million for its failure to report. *Id.*; former RCW 42.17A.765(5). The majority now affirms.

　　This result stands in direct conflict with the result in *Bajakajian*. Bajakajian was criminally charged, and the United States Supreme Court held that forfeiture of the entire amount that he did not report would have been excessive under the Eighth Amendment—because he could be punished only for the crime of conviction, which was a failure to report. GMA violated a civil, regulatory statute and is being fined for the entirety of the amount that it failed to report, plus $7

---

1. Defendant Grocery Manufacturers Association shall pay the amount of $6,000,000.00 as a civil penalty for multiple violations of the state campaign finance disclosure law, RCW 42.17A[,] specifically for
   - concealing the amount accumulated in the Defense of Brands Account;
   - concealing the source of contributions to the Defense of Brands Account;
   - the 60 disclosure reports that were not timely or properly filed identifying the finance activity of the Defense of Brands Account; and
   - the number of days required reports were filed late.

Clerk's Papers at 4072.

7

*State v. Grocery Mfrs. Ass'n*, No. 99407-2
(Gordon McCloud, J., dissenting)

million more. *Bajakajian* holds that when the unlawful conduct is a failure to

report, the Eighth Amendment bars imposition of a penalty that is grossly

disproportionate to the failure to report—no matter how knowing, willful, or

criminal the failure to report is.

II.     The majority improperly weighs the *Bajakajian* factors by declining to
        treat the FCPA violation at issue as a reporting violation

The *Bajakajian* Court noted that the main inquiry in an Eighth Amendment

excessive fines clause case is proportionality. The Court ruled that the "amount of

the forfeiture must bear some relationship to the gravity *of the offense that it is*

*designed to punish*." *Bajakajian*, 524 U.S. at 334 (emphasis added).

Thus, the first question for an Eighth Amendment proportionality inquiry

under the excessive fines clause asks, What is the nature "of the offense that [the

fine] is designed to punish?" *Id.* We examine four factors to determine the answer

to this question and to the related question of whether the penalty is grossly

disproportionate to that "offense": "'(1) the nature and extent of the crime, (2)

whether the violation was related to other illegal activities, (3) the other penalties

that may be imposed for the violation, and (4) the extent of the harm caused.'"[6]

_____

[6] The *Bajakajian* Court did not identify four distinct factors. But courts have extrapolated factors based on the case. *City of Seattle v. Long*, 198 Wn.2d 136, 167, 493 P.3d 94 (2021). This court adopted the Ninth Circuit's test to determine whether a fine is grossly disproportional. *Id*. The four factors above are not exhaustive because *Bajakajian* does not require the consideration of "any rigid set of factors in deciding

8

*State v. Grocery Mfrs. Ass'n*, No. 99407-2
(Gordon McCloud, J., dissenting)

*State v. Grocery Mfrs. Ass'n*, 195 Wn.2d 442, 476, 461 P.3d 334 (2020) (quoting

*United States v. $100,348.00 in U.S. Currency*, 354 F.3d 1110, 1122 (9th Cir.

2004)).

In this case, the impermissible conduct was GMA's failure to file a report.[7]

This is the conduct that GMA should be fined for, not the amount of money that

GMA otherwise lawfully received and spent on campaign speech.

### A. First factor: the nature and extent of the crime

To determine the nature and extent of the crime, we start as the United States

Supreme Court did: with the elements of the statute that the entity violated.

*Bajakajian*, 524 U.S. at 337. Bajakajian was convicted of "willfully" and

"knowingly" failing to file a currency transportation report in violation of 31

U.S.C. §§ 5316(a)(1)(A) and 5322(a). Those are felony, criminal statutes.

But those statutes did not make the currency transported illegal—they

punished only the failure to report. That was critical to the *Bajakajian* Court's

decision. *Id.* ("It was permissible to transport the currency out of the country so

---

whether a punitive fee is" proportional to the offense. *United States v. Mackby*, 339 F.3d 1013, 1016 (9th Cir. 2003).

[7] *See supra* note 5; former RCW 42.17A.235(1) ("In addition to the information required under RCW 42.17A.205 and 42.17A.210, on the day the treasurer is designated, each candidate or political committee must file with the commission a report of all contributions received and expenditures made prior to that date, if any.")

*State v. Grocery Mfrs. Ass'n*, No. 99407-2
(Gordon McCloud, J., dissenting)

long as he reported it."). The dissent accurately recited the legislative history and

purpose of that currency reporting and forfeiture statutes: it was undisputed that the

purpose of those statutes was to prevent money laundering, tax evasion, and drug

trafficking, serious criminal problems that garnered national, federal concern.[8] But

the reporting statute did not punish those crimes—separate criminal statutes did.

So the *Bajakajian* majority ruled that the failure-to-report crime was the one to

which the forfeiture must be compared, not the money laundering, tax evasion, and

drug trafficking that the failure-to-report crime was designed to combat. *Id.* at 338.

Here, the majority takes a different approach. It looks to the "declaration of

policy" in the FCPA to find that GMA's offense "was grave and the extent was

broad." Majority at 11-13. But the majority in *Bajakajian* did not look to the policy

---

[8] The dissent in *Bajakajian* noted that

> smuggling or failing to report cash is more serious than the Court is willing
> to acknowledge. The drug trade, money laundering, and tax evasion all
> depend in part on smuggled and unreported cash. Congress enacted the
> reporting requirement because secret exports of money were being used in
> organized crime, drug trafficking, money laundering, and other crimes. See
> H. R. Rep. No. 91-975, pp. 12-13 (1970). Likewise, tax evaders were using
> cash exports to dodge hundreds of millions of dollars in taxes owed to the
> Government.

524 U.S. at 351 (Kennedy, J., dissenting). Additionally, the dissent noted that because
money laundering and drug smuggling are so difficult to prove, and "[o]ne of the few
reliable warning signs of some serious crimes is the use of large sums of cash," Congress
made a strategic decision to punish *all* cash smuggling or nonreporting with heavy fines,
so long as the conduct was "willful." *Id.* at 353-54.

10

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Grocery Mfrs. Ass'n*, No. 99407-2
(Gordon McCloud, J., dissenting)

provisions of 31 U.S.C. § 5316 to determine whether the fine was excessive. The majority looked to the elements of the crime that Bajakajian was convicted of and the specific conduct giving rise to that crime—failing to file a report. *Bajakajian,* 524 U.S. at 337 (despite differing facts emphasized by the majority and dissent, the majority held that "Respondent's crime was solely a reporting offense"). It was the *Bajakajian* dissent that focused on the uncodified policy choices that convinced Congress to pass the reporting crime and forfeiture statutes.

This court, of course, is bound by the *Bajakajian* majority. I therefore conclude that the nature and extent of the crime in this case was a failure to report, just like in *Bajakajian*.[9] This tends to show that the fine imposed in this case— which related primarily to the amount of money that GMA failed to report rather than to the failure to report itself—was excessive.

---

[9] As the Supreme Court explained in *Bajakajian*, 524 U.S. at 334, under the Eighth Amendment, "The amount of the forfeiture must bear some relationship to the gravity *of the offense that it is designed to punish.* See *Austin v. United States,* 509 U.S. [602,] 622-623[, 113 S.Ct. 2801, 2812 (noting Court of Appeals' statement that "'the government is exacting too high a penalty in relation to the offense committed'"); *Alexander v. United States,* 509 U.S. 544, 559[, 113 S. Ct. 2766, 2776, 125 L. Ed. 2d 441] (1993) ("It is in the light of the extensive criminal activities which petitioner apparently conducted . . . that the question whether the forfeiture was 'excessive' must be considered")". (Emphasis added and fourth alteration in original.)

11

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

State v. Grocery Mfrs. Ass'n, No. 99407-2
(Gordon McCloud, J., dissenting)

### B. Second factor: whether the violation was related to other illegal activities

A federal grand jury indicted Bajakajian on three counts, including making false statements to a customs officer. *Bajakajian,* 524 U.S. at 325. In exchange for his guilty plea to failure to report, the government dismissed the false statements charge. *Bajakajian*, 84 F.3d at 335. The forfeiture count was then tried to the court. *Id*. at 336-37. So Bajakajian's crimes of conviction (failure to report and criminal forfeiture) *could* be said to have been related to the false statements charge that the government dismissed. They *could* even be said to have been related to the problem of drug trafficking and money laundering, which the reporting statutes were designed to attack.

But the majority of the Supreme Court did not say that. Instead, the majority said that there were really no other crimes directly related to the crime of conviction because it "was permissible to transport the currency out of the country so long as he reported it." *Bajakajian,* 524 U.S. at 337. "Thus, the essence of respondent's crime is a willful failure to report the removal of currency from the United States." *Id.* The clear lesson of that decision is that courts risk Eighth Amendment violations if they compare huge fines to unadjudicated crimes and harms, rather than to the elements of the violation itself.

12

*State v. Grocery Mfrs. Ass'n*, No. 99407-2
(Gordon McCloud, J., dissenting)

Here, GMA violated only the civil FCPA. Similar to *Bajakajian*, if GMA had filled out the reports, then all of its transactions and campaign activities would have been permissible. Additionally, the trial court found that GMA had no prior violations of the FCPA, that GMA is not a repeat violator, and that GMA cooperated with the Public Disclosure Commission. Majority at 6 (citing CP at 4069).

The relationship to other related criminal activities in this case seems far more questionable than the relationship to related criminal activities in *Bajakajian*—especially since GMA's campaign receipts, campaign expenditures, and campaign speech, like Bajakajian's transport of currency, was otherwise totally lawful. This also tends to show that the fine imposed in this case was excessive.

### C. Third factor: the other penalties that may be imposed for the violation

Our next question asks, What other penalties that might be imposed for the violation? That question is designed as another possible indicator of rough proportionality.

Under the FCPA, the other penalties that might have been imposed on GMA are all tethered to the actual conduct of failing to report. Former RCW 42.17A.750(1) (2011) identifies a range of possible civil penalties for violations of

13

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

any provision of the FCPA. One section provides for the civil penalty of "not more than ten thousand dollars for each violation" of any provision of the FCPA. Former RCW 42.17A.750(1)(c). Another section provides the civil penalty of "ten dollars per day for each day" that a person fails to file a "properly completed statement or report." Former RCW 42.17A.750(1)(d). And the court has the option to enjoin or compel performance of "any act required herein." Former RCW 42.17A.750(1)(f).

To be sure, subsection (e) provides that "[a] person who fails to report a contribution or expenditure as required by this chapter *may be* subject to a *civil penalty* equivalent to the amount not reported as required." Former RCW 42.17A.750(1) (emphasis added). But when analyzing this factor, even the majority must acknowledge that the other penalties that the FCPA authorizes for the violation are all more modest, measured by more specific statutory amounts, and completely dependent on the conduct of failing to report.

Lower federal courts applying the *Bajakajian* decision have noted the proportionality benefits that such definite statutory calculations produce. For example, the D.C. Circuit court held that *Bajakajian* "was primarily concerned that the potential penalty for illegal export of currency would be indefinite and unlimited—and disproportionate to the offense—if the government could seize whatever amount of currency the unwitting 'exporter' happened to be carrying

*State v. Grocery Mfrs. Ass'n*, No. 99407-2
(Gordon McCloud, J., dissenting)

when caught." *Grid Radio v. Fed. Commc'ns Comm.*, 349 U.S. App. D.C. 365, 278 F.3d 1314, 1322 (2002). That problem is eliminated when a statute fixes fines and "incorporates statutorily required factors for computation of fines." *Combat Veterans for Cong. Political Action Comm. v. Fed. Election Comm'n*, 983 F. Supp. 2d 1, 18-19 (D.D.C. 2013), *aff'd,* 417 U.S. App. D.C. 414, 795 F.3d 151 (2015).

Here, the legislature provided a more definite fine that calculates the penalty based on the conduct itself, not just the amount that a violator failed to report. For example, if the trial court had instead used the "ten dollars per day for each violation" scheme, GMA would have received a $622,820 base fine that would be trebled to about $1.87 million. Suppl. Br. of Pet'r GMA at 14 (citing RCW 42.18A.750(1)(c), (d)). This would still have been the largest FCPA fine ever imposed in Washington State history.[10]

In other words, the other penalties that might be imposed for the nonreporting violations in this case are far less than $18 million. In fact, they are far less than $6 million. Once again, this tends to show that the fine imposed in this case was excessive.

---

[10] *Enforcement of Campaign Finance Laws*, https://www.atg.wa.gov/enforcement-campaign-finance-laws (last visited Jan. 13, 2022).

15

*State v. Grocery Mfrs. Ass'n*, No. 99407-2
(Gordon McCloud, J., dissenting)

### D. Factor four: the extent of the harm caused

The majority asserts that the "harm was substantial and struck at the heart of the principles embodied in the FCPA." Majority at 16 (citing RCW 42.17A.001). And the majority is certainly correct that undermining democracy, campaign fairness, and the integrity of the vote are "substantial" problems.

But that is not what GMA was adjudicated to have done. The government alleged, and the trial court ruled, that GMA failed to report campaign contributions. Failure to report campaign contributions can certainly cause harm. But failure to report currency transport can also cause harm: the currency reporting statutes were enacted for the purpose of deterring and catching drug dealers and profiteers. But Bajakajian was not charged or convicted of money laundering or drug trafficking, and so Bajakajian could not be fined for those offenses. *Bajakajian*, 524 U.S. at 339, 353-55 (Kennedy, J., dissenting). Similarly, GMA was not found to have violated a law that punishes the undermining of democracy, so it cannot be fined for this alleged conduct.

A reporting offense is a reporting offense. That means that the extent of the harm caused by the failure to report in this case is comparable to the extent of the harm caused by the failure to report in *Bajakajian*: depriving the government, and in this case the people, of information. If that harm did not meet the $357,144

16

*State v. Grocery Mfrs. Ass'n*, No. 99407-2
(Gordon McCloud, J., dissenting)

threshold sought by the government in *Bajakajian*, it certainly does not meet the

$18 million threshold imposed by the trial court here.

CONCLUSION

The majority concludes its review of the history of the FCPA by

summarizing, "This suggests the legislature as a whole still approves of a penalty

based on the amount of funds that were concealed in violation of the act."

Majority at 29. The majority is likely correct.

But the question presented in this case is not whether the $18 million penalty

complied with the FCPA. The question is whether that penalty violated the Eighth

Amendment because it was grossly disproportionate to the civil FCPA reporting

violation. Following *Bajakajian*, the answer to that constitutional question is yes.

I therefore respectfully dissent.

_____
Gordon McCloud, J.

_____
Johnson, J.

_____
Madsen, J.

_____
Stephens, J.

17